UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

National Labor Relations Board,                Case No. 11-mc-51480

              Plaintiff,                Mark A. Goldsmith
v.                                             United States District Judge

Center Construction Company, Inc.,             Michael Hluchaniuk
                                               United States Magistrate Judge

              Defendant.
_____/

**REPORT AND RECOMMENDATION
RESPONDENT HOME SERVICE CENTER'S MOTION TO
VACATE PROTECTIVE RESTRAINING ORDER (Dkt. 8)**

## I.    PROCEDURAL HISTORY

The present litigation was initiated in this court on November 21, 2011, by

the filing of a consent judgment against Center Construction Company, Inc. d/b/a

Center Service System Division (Center Service) based on violations of § 8(a)(1)

of the National Labor Relations Act, 29 U.S.C. § 151 *et seq*.  (Dkt. 1).  Almost a

year later, on October 25, 2012, plaintiff National Labor Relations Board (NLRB)

filed an *ex parte* application for a writ of garnishment and a protective restraining

order seeking to garnish assets of Home Service Center, LLC (Home Service)

based on the claim that Home Service was the alter-ego of Center Service and

therefore, Home Service should be responsible for the debt owed by Center

Service.  (Dkt. 2).

An *ex parte* protective restraining order (PRO) was issued on October 29, 2012 (Dkt. 4) and a writ of garnishment was issued on November 1, 2012, to Fifth Third Bank regarding accounts of Home Service at that bank. (Dkt. 6). The PRO contained restrictions on the expenditure of funds by Home Service until the judgment of $189,421.43 was paid.

Home Service was served with the PRO and, on November 5, 2012, filed an emergency motion to vacate the PRO. (Dkt. 8). A response to the motion to vacate was filed on November 7, 2012. (Dkt. 10). A hearing on the motion to vacate took place on November 8, 2012. The PRO was not modified as a result of the hearing but the writ of garnishment was vacated by the stipulation of the parties on November 15, 2012. (Dkt. 15, 16). It was also determined at the November 8, 2012, hearing that an evidentiary hearing should be scheduled regarding the alter-ego issue and that a status conference would take place on December 10, 2012.

An evidentiary hearing was scheduled to take place on December 19, 2012. (Dkt. 12). The NLRB supplemented its response to the motion to vacate on November 29, 2012. (Dkt. 18-20). At the scheduled evidentiary hearing on December 19, 2012, an issue arose regarding the court's jurisdiction over the alter ego controversy in light of the pending bankruptcy of Center Service. A briefing schedule was established to address that issue. (Dkt. 22).

Report and Recommendation
Motion to Vacate Restraining Order
*NLRB v. Center Construction*; Case No. 11-51480

The court ultimately determined, on May 2, 2013, that it had jurisdiction to adjudicate the alter-ego controversy involving Home Service, even if Center Service was in bankruptcy. (Dkt. 34). Thereafter, the resolution of the alter-ego issue, which has become the primary focus of the present motion, was referred to the undersigned on May 2, 2013. (Dkt. 35).

An evidentiary hearing was held on July 31, 2013, where evidence regarding the alter-ego issue was presented. The NLRB filed a post-hearing supplemental brief regarding the alter ego issue on August 23, 2013. (Dkt. 45). Home Service filed a post-hearing supplemental brief on September 6, 2013. (Dkt. 49).

## II.   RELEVANT FACTS

Center Service has existed since approximately 1964 as a business involved in providing heating, cooling, and plumbing services to residential, commercial, and industrial customers until it filed Chapter 7 bankruptcy in August of 2012. (Dkt. 49-6, Pg ID 1126). Robert Eagleson was the owner and president of Center Service. In 2009, Center Service had almost 50,000 customers. *Id*. Kristina Welsh is the daughter of Robert Eagleson and at some point married Matthew Welsh. Kristina Welsh stated that she was employed at Center Service until 2009 and at the time her employment was terminated. She was employed as a technician and production manager. (Dkt. 3-3, Pg ID 110). At some unspecified

time during her employment with Center Service she had been a "vice president."
*Id.* Robert Eagleson had a stroke in December of 2004 and his ability to manage
the business was compromised after that. (Dkt. 3-21, Pg ID 194). Kristina Welsh
"came back" to work at Center Service at times in 2010 and 2011 when her father
was hospitalized. In April of 2012, Robert's wife, Cheryl, stated that she would
come into the business from time-to-time after his stroke and attempt to manage
the business to the best of her ability, with the assistance of other employees, Kat
Humphrey and Deborah Lakey. That effort involved getting Robert to sign checks
and informing him of the progress of work, including the need to lay off
employees when work was slow. (Dkt. 3-21, Pg ID 194). Cheryl Eagleson stated
that, at that time, she had been coming to the office regularly for the prior 3-4
months. *Id*. Mrs. Eagleson stated that, in June of 2012, Center Services was going
out of business at that time. (Dkt. 3-12, Pg ID 167).

Matthew Welsh formed Home Service Center in 2005, while employed at
Center Service. (Dkt. 3-6, Pg ID 131). Home Service is a business involved in
providing heating, cooling, and plumbing services to residential and light
commercial customers. (Dkt. 49-6, Pg ID 1126).

Home Service did not begin to operate until sometime in "late 2007" and
Matthew Welsh left his employment with Center Service in 2008 and served as the
sole manager and supervisor at Home Services after that. (Dkt. 3-4, Pg ID 118).

Welsh also did the service work for the business until another employee was hired. (Dkt. 3-6, Pg ID 132). In 2009, Home Service had almost 1,000 customers. (Dkt. 49-6, Pg ID 1126). Coby Ackerman was hired by Welsh in February 2011 and became the only employee of Home Services. (Dkt. 3-4, Pg ID 118-19).

## III.    ARGUMENTS OF THE PARTIES

### A.    The NLRB Position

With respect to the alter-ego issue, the NLRB contends that Home Service is the alter-ego of Center Service because these two entities have "substantially identical business purpose, ownership, management, supervision, operation, equipment, and customers." Additionally, the NLRB contends that Home Service was established with the "intent ... to assist [Center Service] in avoiding collective bargaining obligations that [Center Service] had." (Dkt. 45, Pg ID 967-68).

Regarding the "business purpose" factor, the NLRB argues that both entities are "contractors engaged in the business of residential and commercial plumbing, heating and air conditioning service and installation." The NLRB also relies on a statement made by Matthew Welsh on August 10, 2011, in which he allegedly described Home Service as "pretty much a name change" from Center Service. (Dkt. 45, Pg ID 968). The NLRB also contends that Center Service and Home Service "operate in the same marketplace ... in and around Flint." *Id*.

Regarding the "ownership, management, and supervision factor," the NLRB

contends that because Kristina Welsh is the daughter of Robert Eagleson, the owner and president of Center Service, and Kristina Welsh and her husband Matthew Welsh "started" Home Service, that a common ownership and control of the two companies has been established.  As to the management and supervision issues, the NLRB argues that Kristina Welsh was the "primary manager and supervisor" at Center Service in 2011 and 2012 and that she "helped" Matthew Welsh manage Home Services during the same time period.  (Dkt. 45, Pg ID 969).

The NLRB submits that Center Service and Home Service were operationally related during 2011 and 2012, which is the relevant time period in the view of the NLRB.  The NLRB alleges that during 2011, a Home Service employee was dispatched to do the last maintenance check-up on Center Service maintenance agreement customers during which the Home Services employee would offer a future maintenance agreement to the customer on behalf of Home Service.  The NLRB alleges that these two entities "shared" employees through the practice of a Center Service employee dispatching a Home Service employee to perform the last maintenance check-up on a Center Service contract and that this work was coordinated by Kristina Welsh, who worked on behalf of both entities during the time period.  (Dkt. 45, Pg ID 975).

Regarding the equipment used by these two entities, the NLRB contends that Center Service shared office equipment in 2011 and 2012 with Home Service

and that Home Service acquired three vehicles from Center Service under circumstances that were not arms-length transactions.  (Dkt. 45, Pg ID 975-76).

The NLRB also alleges that Center Service and Home Service had a substantially identical customer base.  To support this claim, the NLRB states that a Home Service employee was dispatched to perform the final maintenance check-up for Center Service customers 30-40 times and that half of the Center Service customers later became Home Service customers.  (Dkt. 45, Pg ID 977-78).

It is the position of the NLRB that Center Service and Home Service intended on evading their union obligations by "essentially shifting [Center Services'] entire business to [Home Service] before shutting down operations in June of 2012."  (Dkt. 45, Pg ID 978).  The NLRB argues that Center Service transferred work to the non-union Home Service without notice to the union employees that the work was being transferred and that the timing of the transfer in relation to actions of the NLRB and to union activity strongly suggests that Center Service and Home Service were motivated by the desire to evade collective bargaining obligations.  (Dkt. 45, Pg ID 979).

B.   Home Service Position

Home Service contends that it does not have the same ownership as Center Service in that Home Services is owned by Matthew Welsh and Center Service was owned by Robert Eagleson.  (Dkt. 49, Pg ID 1083-84).  Home Service also

argues that the two businesses have different management structures in that during relevant periods Center Service was managed by Robert Eagleson, Cheryl Eagleson, and Deborah Lakey whereas Home Services was managed by Matthew Welsh.  If Kristina Welsh did perform any management functions at Center Service when she was asked to return to the business following her father's illness, such functions were of a limited nature and she did little or nothing in the way of management duties at Home Service.  (Dkt. 49, Pg ID 1084-87).

Regarding the business operations, Home Service submits that the two businesses are not substantially identical.  They have separate locations, they were competitors with each other from the initiation of Home Service in 2007 until Center Service began to refer certain types of business to Home Service in 2011, and they have separate bank accounts, equipment, websites, and phone numbers. (Dkt. 49, Pg ID 1088-90).

While some of the Center Service customers did become Home Service customers, the majority of Center Service customers did not and, therefore, the customer base for the two businesses is not substantially identical.  (Dkt. 49, Pg ID 1092-93).  Additionally, Home Service contends there is no evidence that it had the intent to evade any collective bargaining obligations of Center Service.  (Dkt. 49, Pg ID 1094).

IV.   **ANALYSIS AND CONCLUSIONS**

The alter ego doctrine was "developed to prevent employers from evading obligations under the [National Labor Relations] Act merely by changing or altering their corporate form." *N.L.R.B. v. Allcoast Transfer, Inc.*, 780 F.2d 576, 579 (6th Cir. 1986). A business is an alter-ego of another business when the second business is "merely a disguised continuance of the old employer." *N.L.R.B. v. Fullerton Transfer & Storage Ltd., Inc.*, 910 F.2d 331, 336 (6th Cir. 1990). "[T]o effectuate federal labor law policies, the courts ... have applied ... the alter ego doctrine in a more relaxed, less exacting fashion than would be required under federal common law." *Id.* Generally, the test requires a petitioner to show "pervasive intermingling of funds and operations ... to support a finding that two companies are alter egos of one another." *Trustees of the Resilient Floor Decorators Ins. Fund v. A&M Installations, Inc.*, 395 F.3d 244, 249 (6th Cir. 2005).

In order to establish that a business is the alter ego of another business for purposes of enforcing labor-related obligations of the first business against the alleged alter ego business, it must be determined that the two businesses "have substantially identical management, business purpose, operation, equipment, customers, supervision and ownership." *Road Sprinkler Fitters Local Union v. Dorn Sprinkler Co.*, 669 F.3d 790, 793-94 (6th Cir. 2012), quoting *NLRB v.*

*Fullerton Transfer & Storage Ltd.*, 910 F.2d 331, 336 (6th Cir. 1990).

Additionally, evidence of an employer's intent to evade its labor-related

obligations is a factor the alter ego determination.  *Id*. at 794.  "The analysis is

flexible and 'no one element should become a prerequisite to imposition of alter-

ego status; rather, all the relevant factors must be considered together.'" *Id*.,

quoting *Allcoast Transfer, Inc.*, 780 F.2d at 582.

        Petitioner seeks to establish that Home Service is the alter ego of Center

Service for the purpose of collecting a judgment of approximately $190,000.00

against Home Service that had previously been entered against Center Service.

Petitioner, the NLRB, has acknowledged that they have the burden of proof to

demonstrate an alter ego relationship between Center Service and Home Services.

(Dkt. 43, Tr. of 07/31/13 Hrg., p. 8).

        A.      Business Purpose

        The NLRB asserts that Center Service and Home Service had a common

business purpose because they dealt in the same product or service. (Dkt. 45, Pg

ID 968).  In support of that assertion, the NLRB characterizes Center Service and

Home Service as "engaged in the business of residential and commercial

plumbing, heating and air conditioning service and installation."  *Id*.  The specific

references to the record made by the NLRB describes Center Service as being

"engaged in the sale, installation, and service of heating, air-conditioning, and

plumbing systems" and describes Home Service as performing "plumbing, heating and air-conditioning service, repair, maintenance and installation." *Id.*

While acknowledging some similarities between Center Service and Home Service, Home Service contends that there are important differences between the two businesses. (Dkt. 49, Pg ID 1093-94). Matthew Welsh stated that Center Service provided "heating, cooling, and plumbing services to residential, commercial, and industrial clients." (Dkt. 49-6, Pg ID 1126). He also stated that Home Service provided "residential and light commercial heating, cooling, and plumbing services" with the plumbing services being "limited" in nature. (Dkt. 49-6, Pg ID 1126). Home Service also notes that the two businesses had different trade licences and certifications. (Dkt. 49, Pg ID 1094).

This evidence indicates that both businesses did heating, cooling, and plumbing work but that the scope of their work differed, to some degree, with Center Service being involved in residential, commercial, and industrial work and Home Service only being involved in residential and light commercial work. No evidence has been offered to show an allocation of the business of either company among these general categories.

The NLRB also points to a statement attributed to Matthew Welsh in which he states that Home Service is "just pretty much just a name charge" from Center Service. (Dkt. 45, Pg ID 968). While there does not appear to be a challenge that

Matthew Welsh made this statement, the context it was made in should be taken into account when assessing its weight.  The statement by Matthew Welsh was made during a conversation he had with Lance Fraim on August 10, 2011, in which Mr. Fraim, a union organizer, was pretending to be a concerned son-in-law of an older couple that was supposedly worried about not doing business with Center Service any longer and wanted to make sure their needs would be taken care of by Home Service like they were with Center Service.  The remainder of the conversation relates to a number of things including the procedure that would have to be followed for the couple to sign a new agreement and arrange for payment with Home Service.  While it is fair to say that Matthew Welsh's statement reflects that the practices of Home Service regarding residential furnace maintenance agreements would be similar to those of Center Service, this evidence does not address in any way similarities between Center Service and Home Service as to any other aspect of their respective businesses.  The statement is not particularly probative of the similarity of their business purposes overall.

The NLRB also supports its argument with the fact that Center Service and Home Service are located in the same geographic area and therefore would "operate in the same marketplace."  (Dkt. 45, Pg ID 968).  Home Service did not challenge this contention.

*Dorn Sprinkler* considered the business purpose/same marketplace factor as

a necessary predicate to consideration of the alter-ego analysis.  "Where two companies are engaged in the same business in the same marketplace, courts [can consider] whether one is the alter ego of the other."  669 F.3d at 794.  While there are differences in the overall business profiles of Center Service and Home Service, there are sufficient similarities between the two businesses, along with operating in the same marketplace, to warrant consideration of the alter-ego claim of the NLRB based on the other factors identified in *Dorn Sprinkler*.

      B.    <u>Supervision and Ownership</u>

The NLRB contends that substantially identical ownership is established where two business are owned by members of the same family, citing *NLRB v. Dane County Dairy*, 795 F.2d 1313, 1322 (7th Cir. 1986).  Indeed, *Dane County* states that "[f]amilial control constitutes common ownership and control."  *Id*.  However that does not appear to be the rule in the Sixth Circuit, where supervision and ownership are essentially a single factor in the alter-ego analysis.  In *Dorn Sprinkler*, the company that incurred the labor-related obligation, Dorn Sprinkler Company, was owned by David Dorn, his son Christopher Dorn was the "lead" salesman, and his daughter Amy O'Shaughnessy was front office manager and bookkeeper.  The alleged alter ego business, Dorn Fire Protection, was owned by Christopher Dorn who was also the president of the business, Amy O'Shaughnessy was the bookkeeper, and David Dorn was a "consultant."  In

examining the alter ego question in *Dorn Sprinkler*, the court stated that "even though the characters are the same and are related to one another, this does not necessarily mean the overall nature of management is the same in both companies." *Id.* The court found that although Christopher Dorn was the owner and president of Dorn Fire, he was not shown to have managed Dorn Sprinkler even if he were the "lead" salesman. The court also found that while David Dorn had owned Dorn Sprinkler, he now owned a separate business and was a consultant to Dorn Fire and other businesses as well. Amy O'Shaughnessy was found to have not managed either business. *Id.* at 795. It is clear that a familial relationship, in and of itself, between the principals of the indebted business and the alleged alter ego business does not "make the management of [the] two companies substantially identical" in the Sixth Circuit. *Id.*

Using *Dorn Sprinkler* as a standard in terms of ownership, the present case represents a far less compelling case of identity of ownership than the facts in *Dorn Sprinkler*, which the Sixth Circuit did not find to be particularly compelling. Robert Eagleson "owned" Center Services and Matthew Welsh "owns" Home Services. No evidence to the contrary has been produced.

The NLRB points to several factors in support of its position regarding substantial identity of the management between Center Service and Home Service. Initially it states that Robert Eagleson was president and owner of Center Service

and that his daughter, Kristina Welsh, married Matthew Welsh, the president and owner of Home Service. While there is no dispute as to those facts, they do not establish substantial identity of management between the two businesses. The NLRB attempts to link Kristina Welsh to the management of Home Service by a statement made by Matthew Welsh that "he and his wife started" Home Service. (Dkt. 45, Pg ID 969). This statement was made in the conversation with Lance Fraim, described earlier in this report, who had asked to meet with Matthew Welsh in August of 2011 based on the false premise that his wife's parents were concerned about now doing business with Home Service after doing business with Center Service and Mr. Fraim wanted "to make sure they get taken care of like they used to when Center Service did all their service." (7/31/13 Hrg. Ex. 17, p. 3). It is clear that Mr. Fraim went to the meeting with the goal of getting Matthew Welsh to make statements, based on the ruse of his wife's aging parents' concerns, that Home Service was similar to Center Service. Matthew Welsh attempted to reassure him that his wife's parents would be treated the same as they had been with Center Service by stating that "we started Home Service Center ... and we are incorporating the same policies, procedures, training, so on and so forth [as Center Service]."

It is not at all clear what "starting" a business means in terms of the ownership and management of the business. The meaning of this term is even less

clear in the context of this conversation with Mr. Fraim which involved Mr. Welsh trying to address what he thought were the concerns of the son-in-law of an elderly couple.  Mr. Welch has stated in a deposition taken in August of 2012 that he was the "sole manager and supervisor of Home Service since its founding."  (Dkt. 3-4, Pg ID 118).  He stated in an affidavit signed in November of 2011 that he is the "sole owner" of Home Service, that he is the "sole manager," and that he "formed the business."  (Dkt. 3-6, Pg ID 131).  Kristina Welsh has stated in an affidavit signed in November of 2011 that she was not employed by Home Service, that she did not have an ownership interest in Home Service, and that she was not involved in any of the business for Home Service.  (Dkt. 3-18, Pg ID 178).

The main argument of the NLRB regarding identity of supervision/ management between the two businesses focuses on the role of Kristina Welsh. During the most relevant period of time, 2011-2012, the NLRB contends that Kristina Welsh was a manager/supervisor at Center Services.  The factual basis of this argument is that Kristina Welsh provided re-employment orientation to Wayne Rose and Scott Mobilio in January and May of 2011, that she hired Kathy Humphrey in May of 2011, and supervised the work of Kathy Humphrey after that including directing Kathy Humphrey to have Coby Ackerman, a Home Service employee, perform the final maintenance work for Center Service maintenance contract customers, and that she dispatched after- hours work for Center Service as

late as May of 2012.

With respect to the management work of Kistina Welsh at Home Services, the NLRB points out that she was listed as the "master plumber" for Home Services until November of 2011, that she dispatched Ackerman, a Home Services employee, to do the final maintenance work on Center Service contracts in 2011 and 2012, that she attempted to recruit Todd Daniels, a Center Service employee, to come to work for Home Service in August of 2011, and that she signed the maintenance agreement with Bonnie Pearce on behalf of Home Services.  (Dkt. 45, Pg ID 971-73).

As the NLRB points out, a contractor that seeks a plumbing license from the State of Michigan must either be a master plumber or employ a master plumber and that master plumber must supervise plumbing jobs to "secure full compliance" with plumbing requirements.  (Dkt. 45, Pg ID 972).  While it is undisputed that Kristina Welsh was designated as a master plumber for Home Services for a period of time including November of 2011, there is no evidence that she actually performed any plumbing work for Home Services.  Additionally, even if she had engaged in plumbing work for Home Services, supervising a plumbing job to ensure compliance with plumbing code does not equate to being a supervisor of the company as a whole.

Another area without dispute is that Kristina Welsh dispatched Ackerman, a

Home Services employee, to perform the final maintenance work on some Center

Service agreements for periods of time in 2011 and 2012.  The NLRB asserts that

this conduct shows the exercise of management authority on behalf of Home

Services.  If it is possible to draw an inference of Home Services *management*

from these facts, it is not a very strong inference.  The actual work done is that of a

dispatcher and dispatching does not necessarily reflect the exercise of a

management function.  Indeed, Kathy Humphrey was also dispatching Ackerman

to perform the same work and it would be hard to say that was managerial work.

If Kristina Welsh decided to do that in the exercise of her clear authority as a

manager, one might conclude she was acting on behalf of some business, but it is

not obvious if she was acting on behalf of Center Service or Home Services in

doing that.  The fact that these efforts might have benefitted Home Services in the

long run does not mean that the actual conduct was carried out on behalf of Home

Services.  The record evidence indicates that Center Service was getting out of the

maintenance agreement business and was referring their customers to Home

Service for maintenance agreements.  This arrangement had been initiated by

Robert Eagleson with the knowledge of Matt Welsh and there is no evidence that

Kristina Welsh did anything other than implement an arrangement made by others,

rather than exercising managerial discretion of her own.[1]

Another factor that the NLRB mentioned in arguing their position is the claim that Kristina Welsh had "hiring authority" for Home Services. This argument is premised entirely on an incident in August of 2011 when Kristina Welsh told Todd Daniels, then a Center Service employee, that Center Services' customers were becoming Home Service customers and "they" wanted Todd to come to work at Home Services, which he never did. (Dkt. 43, Pg ID 782). This is simply an insufficient factual predicate to conclude that Kristina Welsh had "hiring authority" for Home Services. Matt Welsh had stated in a deposition taken in August of 2012 that he was the only person with authority to hire people for Home Services. (Dkt. 3, Pg ID 11).

The NLRB points out statements that Kristina Welsh has made that are arguably inconsistent with some of the evidence in the case and that Home Services failed to call Kristina as a witness during the July 31, 2013 evidentiary hearing in this case. Inconsistent statements certainly have a bearing on the credibility of a declarant but those statements do not necessarily equate to affirmative evidence on a matter in controversy. Additionally, the failure of Home

---

[1] Matt Welsh stated in an affidavit that Robert Eagleson had decided to send letters to his maintenance agreement customers at Center Service when he decided to get out of the maintenance agreement business in March or April of 2011. The letter referred the Center Service customers to Home Service for future maintenance agreements and Matt Welsh was aware of the letter being sent. (Dkt. 49-4, Pg ID 1119).

Services to call Kristina Welsh as a witness on July 31, 2013 does not represent an admission of any facts or a concession of any arguments made by the NLRB. The insufficiency of proof on a particular issue is a problem for the party with the burden of proof and, here, that is the NLRB.

The supervision and management factor does not weigh in favor of finding alter ego status.

C.    Operational Relationship

Another factor in the alter ego determination is the operational relationship between the two entities. *Dorn Sprinkler*, 669 F.3d at 793-94. Specifically, the issue is whether the "'two enterprises have substantially identical ... operation[s].'" *Id.* In analyzing this factor in *Dorn Sprinkler*, the court considered whether the two businesses were competitors and whether there was "continuity of work force" between the two businesses.

The NLRB argues that Center Service and Home Services were not competitors in 2011 and 2012 based on the transfer of maintenance agreement customers from Center Service to Home Services during that time frame. The *Dorn Sprinkler* court looked at the historical relationship between the two businesses over an extended period of time and not just for the final two years of the business operation of the business with the obligation. In *Dorn Sprinkler*, the fact that the businesses were competitors when the claimed alter ego company first

started, maintained separate office space and attracted customers and employees of its own, weighed against finding alter ego status. In the present case, the NLRB contends that during the final two year period of the operation of Center Service some of the customers of Center Service became customers of Home Service through an organized effort to transfer those customers. As Home Service points out, that business was started in 2005, became operational in 2007 on a part-time basis and full-time in 2008 when Matt Welsh left his job at Center Service. No evidence has been offered to show that they were not competitors between 2007 and 2011, even if it is assumed there was no competition as to service agreement customers in 2011 and 2012.

Additionally, there were differences in their customers in both type and number such that it would be hard to say that they were identical from an operational point of view. Center Service provided heating, cooling, and plumbing services to residential, commercial, and industrial customers. In 2009 Center Service had approximately 49,640 customers. Home Services provided heating, cooling, and limited plumbing services to residential and light commercial customers. In 2009, Home Services had approximately 985 customers. (Dkt. 49-6, Pg ID 1126). These figures are the only evidence in the record as to the number of customers for the respective businesses. These differences weigh against a finding of operational identity. It is not clear exactly how many maintenance

agreement customers migrated from Center Service to Home Services in 2011-12, so it cannot be determined what the significance of that is in terms of the overall business operation of Home Services. Matthew Welsh stated in November of 2011 that Home Service received about 100 calls from Center Service customers following the letter that Center Service sent. (Dkt. 3-6, Pg ID 135). He also testified in August of 2012 that "over 50 percent of the people that had a service contract [with Center Service] are on contract now with Home Service." (Dkt. 3-4, Pg ID 123). The record does not include evidence as to how many customers that really represents. If the maintenance agreement customers of Center Service were a very small percentage of the almost 50,000 customers they had in 2009 then 50% of that might not amount to very much. It is not possible to make a finding that Center Service and Home Service are operationally the same, or even substantially similar, based on this record.

With respect to the continuity of work force, the *Dorn Sprinkler* court looked at how many employees of Dorn Sprinkler, working close to the time the business closed, became employees of Dorn Fire Protection. Only two of the fourteen Dorn Fire Protection employees had previously worked for Dorn Sprinkler which showed "no real continuity of work force" between the two businesses. The NLRB argues that Center Service and Home Services had "extensive ... shared personnel" including Coby Ackerman, Katherine Humphrey,

and Kristina Welsh. The argument appears to focus on the same two year period and only relates to the process involving Ackerman performing the final inspection for Center Service maintenance agreement customers, as dispatched by Humphrey and Kristina Welsh. It would not be accurate to characterize Ackerman as a Center Service employee even though some of his efforts might have relieved Center Service from a contractual obligation to perform those final inspections. The concept of being an "employee" for this purpose has to be more than performing an undefined amount of work that benefits Center Service. Neither side defines "employee" for this analysis but Black's Law Dictionary defines "employee" as "[a] person who performs services pursuant to a contract of employment, express or implied." Using this definition, Ackerman cannot be considered an "employee" of Center Service because there was no contract of employment and Humphrey cannot be considered an "employee" of Home Services for the same reason. The fact that either one of them may have done something to provide a marginal benefit to another business does not make them an employee of the other business.

The NLRB also alleges that Kristina Welsh was another "shared" employee based on the same set of facts - the claim that Ackerman was dispatched to perform the final maintenance service on Center Service customers in 2011-12. While there is evidence that Humphrey dispatched Ackerman for this purpose at

the direction of Kristina Welsh, there is no evidence that Welsh dispatched

Ackerman herself in this manner.  While she may have had dispatch responsibility

during relevant periods, that is not the same as evidence that she actually

dispatched Ackerman for this purpose.  Additionally, other than a few isolated

occasions,[2] there is no evidence that Kristina Welsh served as an "employee" for

Home Service after Center Service went out of business.  Based on the facts in this

record, the NLRB has not demonstrated that there was a "continuity of work

force" between Center Service and Home Services.

>    D.    Identity of Equipment

The NLRB argues that Center Service and Home Service "have

substantially identical equipment" and therefore this factor weighs in favor of

finding that Home Service is the alter ego of Center Service.  (Dkt. 45, Pg ID 975-

76).  Home Service contends each of the businesses had its own equipment and, as

a result, this factor does not weigh in favor of finding alter ego status for Home

Service.

In *Dorn Sprinkler*, the Court found that Dorn Fire Protection had acquired a

"limited number of tools and three pickup trucks from Dorn Sprinkler" after Dorn

Sprinkler had gone out of business.  The court additionally found that, in light of

---

[2] The NLRB offered evidence that Kristina Welsh signed a single maintenance agreement on behalf of Home Service.  07/31/13 Hrg., Ex. 20.

the fact that Dorn Fire Protection had acquired these assets after Dorn Sprinkler had gone out of business, Dorn Fire Protection "began operations with all of its own tools." 669 F.3d at 795-96. The court concluded that this "overlap in equipment ... was insubstantial." *Id*.

The factual basis of the argument of the NLRB is that during 2011-12 Center Service phones and computers were used to dispatch a Home Service worker to perform maintenance work for Center Service customers and that Home Service acquired three vehicles from Center Service. While there is evidence that such conduct did take place, in the absence of evidence indicating this was substantial, pervasive use of Center Service telephones and computer systems, the alleged use of Center Service equipment of this nature seems relatively modest. It is reasonable to infer that the Center Service telephones and computer systems had additional uses because the evidence has shown that Center Service did other things and had many other customers than Home Service had during the periods of time that both places were in business.

As to the vehicles Home Service acquired from Center Service, Matt Welsh has stated that he obtained the vehicles from Mr. Eagleson personally, although it was acknowledged that the vehicles were used in the Center Service business. (Dkt. 3-6, Pg ID 133). One of the two vans was acquired in 2011 for $100.00 but needed $5,000.00 of work to make it "road worthy" and neither van was in use at

the time of transfer to Home Service because they "needed repairs." The second 2004 van was acquired along with a 1999 pick-up, according to Welsh, in lieu of a Chevrolet Suburban, which Welsh said he was supposed to get during his employment with Center Service. As of the date of the statement by Welsh, November 16, 2011, the van was in use by Home Service but the pick-up was no longer running. *Id*. No evidence has been offered as to the value of the vehicles at the time of the transfer to Home Service so it cannot be determined that valuable business assets were transferred by Center Service to Home Service in a less than arm's length transaction and the circumstances reflected in the Welsh affidavit suggest that the vehicles were not very valuable at the time of the transfer.

Matt Welsh has also stated that, in November of 2012, Home Service does not "share, rent, or lease" equipment with Center Service. (Dkt. 49-6, Pg ID 1126) and he stated in November of 2011 that he had not purchased any tools from Center Service. (Dkt. 3-6, Pg ID 135). Even if there were arguably some use of Center Service equipment (computer and phones) during periods of 2011 and 2012 that benefitted Home Service, that use was not substantial based on the evidence in this record. Additionally, the transfer of three used vehicles of uncertain value from Center Service to Home Service does not establish an "identity" of equipment between Center Service and Home Services. Using *Dorn Sprinkler* as a benchmark in this analysis, some tools and three pickup trucks were transferred

after Dorn Sprinkler went out of business. Dorn Fire Protection began operation before Dorn Sprinkler went out of business and it was of some importance to the court that Dorn Fire Protection began operation with all of its own tools and that some of Dorn Sprinkler's equipment was sold or transferred to other companies besides Dorn Fire Protection. In the present case, Home Service began operation in 2008 and there is no evidence that it began those operations with tools or other equipment that it acquired from Center Service. Further, other than the three used vehicles acquired in approximately 2011, when Center Service was essentially going out of business, there is no evidence that any other equipment belonging to Center Service was transferred to Home Service. The evidence offered by the NLRB does not demonstrate an identity of equipment between the two businesses and this factor weighs against an alter-ego finding.

>   E.   Identity of Customer Base

The NLRB argues that Center Service and Home Service have a "substantially identical customer base as it concerns their maintenance agreement customers." (Dkt. 45, Pg ID 977). In support of that argument, the NLRB points out that Home Service technician Ackerman was dispatched 30-40 times to perform the last maintenance agreement service for Center Service customers and that could have happened more times given that Kristina Welsh was doing some of the dispatching during 2011 and 2012. *Id*. Further, the NLRB contends, Matt

Welsh stated that more than 50 percent of Center Service maintenance agreement customers became Home Services customers. *Id.* The NLRB asserts, in footnote 16 of their brief, that counsel for Home Service "represented" at the July 31, 2013, hearing, that 500 of Home Service's 1,000 customers were formerly Center Service customers. (Dkt. 45, Pg ID 978). Actually, what was said at the hearing by Home Service counsel was that Matthew Welsh had "testified" that "at most" half of the 1,000 Home Service customers were formerly Center Service customers, which counsel estimated to be approximately 500. This is not an admission by Home Service that 500 of the Home Service customers were formerly Center Service customers. It is the argument of counsel during oral argument on the alter ego issue and not evidence. Additionally, it is a somewhat inaccurate statement of the evidence in the case. The record is as reflected above with Matthew Welsh stating that more than 50% of Center Service "maintenance agreement customers" became Home Service customers, but that was never reduced to a specific number of customers or even an informed estimate of the number of customers.

Home Service submits that the evidence shows that perhaps 100 people with expiring Center Service maintenance agreements contacted Home Services with respect to signing a Home Service maintenance agreement. (Dkt. 49, Pg ID 1093). Home Service also notes that the evidence in the record indicates that

Center Service had approximately 50,000 customers while Home Services had approximately 1,000. *Id.*

In *Dorn Sprinkler*, the court found that only nine of the Dorn Fire Protection's 250 customers had been Dorn Sprinkler customers. 669 F.3d at 796. This represents approximately 4% of the Dorn Fire Protection customers. The NLRB argues that perhaps 50% of Home Service customers were formerly Center Service customers but, as indicated above, that figure is not supported by the evidence. Even if that were the case, the fundamental issue is whether the evidence shows that Home Service was a "disguised continuance" of Center Service. Center Service had, based on the only evidence in this record, approximately 50,000 customers of all types. At most, 2% of Center Service customers (assuming Home Service had 1,000 customers of all types) became Home Services customers. These numbers simply do not present a persuasive case for finding identity of customer base between the two businesses. As with other factors, the NLRB has the burden of proof, as it has acknowledged, and based on the evidence in this record, this factor does not weigh in favor of an alter ego finding.

F.    Intent to Evade

"Evidence, or lack thereof, of an employer's intent to evade the obligations of a collective bargaining contract is merely one of the factors to be considered

and is not a prerequisite to the imposition of alter-ego status."  669 F.3d at 794.

The NLRB contends that evidence of an intent to evade the obligations of a

collective bargaining contract exists in this case based on several facts.  The first

of these facts is that Center Service "shifted" its "entire" business to Home Service

before shutting down in June of 2012.  (Dkt. 45, Pg ID 978).  This diversion of the

maintenance agreement customers took place "secretly" in that Kristina Welsh

informed the dispatcher for Center Service to not tell other Center Service

employees that a Home Service employee was doing the final maintenance work

for Center Service maintenance agreement customers.  Further, this alleged

transfer of business began in March or April of 2011, shortly after the Plumbers

and Pipefitters Union "demanded," on January 31, 2011, that Center Service sign a

collective bargaining agreement.

Home Service denies that it had an intent to evade the collective bargaining

obligations of Center Service by pointing out that Matthew Welsh stated that he

started his business because he felt that Center Service "would not continue to be

viable" rather than out of an intent to evade the obligations of Center Service.

(Dkt. 49, Pg ID 1094).  Matthew Welsh started Home Service in 2005, but did not

"start operating" until late 2007 and 2008.  (Dkt. 3-6, Pg ID 131).

In *Dorn Sprinkler,* the company Dorn Sprinkler failed to make employer

contributions of various employee benefit funds in late 2006 and early 2007, and

went out of business in March of 2007.  Christopher Dorn, the son of the owner of Dorn Sprinkler, who had been the lead salesman at Dorn Sprinkler, changed the name of an existing business to Dorn Fire Protection in October of 2006 and began operations.[3]  669 F.3d at 792.  The Court ultimately found that the timing of Christopher Dorn leaving the Dorn Sprinkler business to form his own business, shortly before the failure of Dorn Sprinkler to pay into various employee benefit funds, did not give rise to a reasonable inference that Christopher Dorn's actions were undertaken with an intent to evade the payment of Dorn Sprinkler's obligations.

In the present case, Matthew Welsh began operations of Home Service several years before Center Service received the demand from the union to sign a collective bargaining agreement in January of 2011.  No inference of an intent to evade can reasonably arise from the timing of the formation of Home Service.  The NLRB argues that the transition of some of Center Service customers to Home Service following the demand for collective bargaining in January of 2011 is a "suspicious" circumstance and those events cannot be attributed to the failing health of Robert Eagleson because no one has testified that was the case.

---

[3] Christopher Dorn had started a business in the 1990s named Dorn Fire Protection, Inc. but had not started doing business.  The name of the business was changed to Dorn Fire Protection, LLC in October of 2006, shortly before the financial problems of Dorn Sprinkler, and it then began operations.  669 F.3d at 792.

Report and Recommendation
Motion to Vacate Restraining Order
*NLRB v. Center Construction*; Case No. 11-51480

However, no one has testified that this transition of some customers was undertaken with the intent to evade and yet the NLRB seeks a finding that such was the case. Inferences can be drawn from circumstantial evidence in the absence of direct evidence on the subject.

This alter ego analysis has to be conducted with consideration of all of the facts. The relevant facts are that Robert Eagleson was the president and sole owner of Center Service and in 2004, the business became bad enough that Robert Eagleson had to loan the business money that was never paid back and he did not draw a paycheck from the business in 2003 and 2004. (Dkt. 3-21, Pg ID 192). In December of 2004, Mr. Eagleson suffered the first of his strokes and his ability to operate the business was limited after that happened. (Dkt. 3-21, Pg ID 194). Cheryl Eagleson, Robert's wife, would come to the business from time-to-time and check on how things were going and would communicate the progress of things to her husband with her husband making decisions if he could. *Id*. The day-to-day operation of the business was run by others. *Id*.

Center Service stopped offering service contracts in March or April of 2011 and Robert Eagleson apparently caused a letter to be sent to an unknown number of Center Service, service contract customers informing them that Center Service was not going to offer that service any longer and that Home Service was recommended for future service contracts. (Dkt. 3-6, Pg ID 134). Home Service,

which had offered similar service contracts "in or around 2009," received about 100 calls from the letter sent out by Robert Eagleson as of November 16, 2011. (Dkt. 3-6, Pg ID 134-35).

While the NLRB argues that the events of 2011 relating to the cessation of the service contract business by Center Service is "suspicious" because it followed so closely the demand of the labor union to engage in collective bargaining, the other circumstances outlined above, relating to the failing health of Robert Eagleson and the general decline in business, reasonably permit an inference that Eagleson was winding down the business for those more innocent reasons. The fact that he would recommend his son-in-law's business for his former customers to use in the future seems to be a rather predictable practice and one that does not necessarily lead to the conclusion that it was done to evade his obligations to the labor union. Even if one were to assume that Eagleson closed his business, in part, due to the financial obligations to the union, that does not inescapably lead to the conclusion that Home Service became the alter ego of Center Service.

## V.    RECOMMENDATION

Based on a consideration of the factors identified in *Dorn Sprinkler*, the undersigned does not find that the NLRB has proven that Home Service is the alter ego of Center Service and therefore recommends that the motion of the NLRB requesting such a finding be denied. Other issues raised in the present motion

(Dkt. 8) have already been addressed.

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1981). Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed.R.Civ.P. 72(b)(2), Local Rule 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may

Report and Recommendation
Motion to Vacate Restraining Order
*NLRB v. Center Construction*; Case No. 11-51480

rule without awaiting the response.

Date: February 21, 2014          s/Michael Hluchaniuk
                                 Michael Hluchaniuk
                                 United States Magistrate Judge

**<u>CERTIFICATE OF SERVICE</u>**

I certify that on <u>February 21, 2014</u>, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system, which will send electronic notification to the following: <u>Kelly M. Kammer, David H. Mori, Scott Preston and Sarah Pring Karpinen</u>.

s/Tammy Hallwood
Case Manager
(810) 341-7887
tammy_hallwood@mied.uscourts.gov

Report and Recommendation
Motion to Vacate Restraining Order
*NLRB v. Center Construction*; Case No. 11-51480